MARK THORP,

Plaintiff,

v.

THE DISTRICT OF COLUMBIA, *et al.*,

Defendants.

Civil Action No. 15-195 (JEB)

## MEMORANDUM OPINION

Emily Dickinson once said of dogs, "They are better than [human] beings because they know but do not tell." Unfortunately for Plaintiff Mark Thorp, the only neutral witness in this case is his Doberman pinscher named Vaughn. According to Defendants, two officers with the Metropolitan Police Department observed Thorp beat his dog, necessitating a rescue mission inside his home. Plaintiff vigorously disputes such accusation, alleging that the officers fabricated all evidence of animal cruelty, executed not one but two faulty warrants of his home, arrested him without probable cause, illegally seized cash and other property, and, to add salt to the wound, needlessly impounded the Doberman. Seeking relief for such grievances, he filed this civil suit against the District of Columbia and Lieutenant Ramey Kyle, the commander who executed the search warrants.

So long as Vaughn stays silent, the Court may never know precisely what unfolded that day. As it turns out, however, these factual disputes matter not for purposes of this action. Even construing the facts in the light most favorable to Plaintiff, the Court finds that summary judgment in favor of Defendants is appropriate.

## I.    Background

The Court has previously detailed the background behind Plaintiff's suit.  See Thorp v. Dist. of Columbia, 142 F. Supp. 3d 132, 135-136 (D.D.C. 2015).  It therefore limits the discussion here to the contested searches and seizures of February 4, 2015.  As Defendants ultimately prevail, the Court recounts these facts in the light most favorable to Plaintiff.  This is no easy task, however, as Thorp does not attach copies of the depositions to which he cites.  The Court will therefore rely, when available, on the excerpts of those depositions provided by Defendants.

On February 4, two officers in the MPD's Vice Unit — Fredrick Onoja and William Rapp — were stationed in a church parking lot near Thorp's home at 1029 16th Street N.E.  See Def. MSJ, Exh. 3 (Deposition of William Rapp) at 32:1-7; Exh. 4 (Deposition of Fredrick Onoja) at 43:12-21.  At approximately 7:35 a.m., the officers purportedly saw and heard Plaintiff "forcefully strike" his dog, a 17-month Doberman pinscher.  Compare Def. MSJ, Exh. 1 (First Search Warrant Aff.) at 1; Onoja Dep. at 43:6-11 ("Q: You saw Mr. Thorpe [sic] hit his dog that morning? A: Yes."); Rapp Dep. at 60:3-9, 62:22 ("I saw Mr. Thorp hit the dog."), with ECF No. 101-1 (Pl. Response to Def. SMF), ¶ 2 (questioning whether officers were in position to observe such behavior).  Thorp then took the dog inside the house and did not return, id., ¶ 4, denying Officers Onoja's and Rapp's requests to speak with him.  Id., ¶¶ 5, 6.

Those officers then reported — falsely, according to Thorp — the incident to Washington Humane Society Law Enforcement Officer Ann Russell, who in turn applied to the D.C. Superior Court for a search warrant of Plaintiff's home.  See First Search Warrant Aff. at 2; id., Exh. 10 (Deposition of Ann Russell) at 37:10-22, 39:11-14, 40:2-12, 63:14-19.  Judge Ramsey Johnson approved the application, authorizing a search for "[a]nimals physically abused

(dead or alive, born or unborn, above ground or below)[,] bowls, water bowls, or any other evidence of animal cruelty/neglect" that evidenced "commission of a crime in violation of Title 22, Section 1001, D.C. [Code]." First Search Warrant.

At that point, Lieutenant Kyle — the sole officer sued in his individual capacity — entered the picture. According to Thorp, Kyle previously "had a sexual relationship with [] Plaintiff's ex-girlfriend." ECF No. 94-1 (Pl. SMF), ¶ 37. He also, coincidentally or not, commanded a team of thirteen officers executing the search warrant. See ECF No. 93 (Pl. MSJ) at 7, 11 (citing Russell Dep. at 41-42). The unit arrived at roughly 3:00 p.m., and within ten minutes, the humane officers had secured the dog. Id., Exh. PP (photograph). Both Russell and fellow Humane Law Enforcement Officer Daniel D'Eramo observed the dog was uninjured and in good health, see Russell Dep. at 83:1-6; Def. MSJ, Exh. 11 (Deposition of Daniel D'Eramo) at 102:15-16; 114:6-11, and neither discovered additional evidence of animal cruelty. See Russell Dep. at 100:7-15; D'Eramo Dep. at 139:3-4.

Nevertheless, the search persisted. Plaintiff alleges that Kyle's true motive was to uncover illegal drugs in the home, as the "local neighborhood boss"— i.e., Kathy Henderson, an Advisory Neighborhood Commissioner — had apparently long targeted him as a suspected drug dealer. See Pl. SMF, ¶ 43; Pl. Reply at 40. Whether spurred by political pressure from Henderson or, perhaps, personal animosity, Thorp believes "Kyle knew exactly what he wanted to find when he smashed down the doors of the Plaintiff's home and it had nothing to do with spurious allegations of animal cruelty." Pl. MSJ at 43. In that vein, Kyle continued searching "closed containers," including the freezer, well after the dog was safely outside. See Pl. SMF, ¶ 67; see also Def. MSJ, Exh. 5 (Deposition of Andrew Gamm) at 124:5-11 (noting that Kyle opened the closed freezer door). Inside the freezer, the Lieutenant found two unmarked zip-top

bags full of capsules, which he says he immediately recognized as illicit substances. See Def. MSJ, Exh. 12 (Deposition of Ramey Kyle) at 115-18. In a subsequent field test, the pills reacted positively for amphetamines. Id., Exh. 2 (Second Search Warrant Aff.) at 2.

Thorp insists that he had a prescription for the pharmaceuticals and that Kyle "was present in . . . [a] room where the prescription bottles were in plain view." Pl. SMF, ¶ 77 (citing Kyle Dep. at 126-127). The officer nonetheless called MPD Sergeant Paul Hong to report his discovery, never mentioning said prescriptions. See Kyle Dep. at 118:16-120:5; Second Search Warrant Aff. at 2. Another officer within the unit then applied for a second search warrant for Thorp's home, this one for drugs and related materials, including suspected "cash proceeds" concealed there in "[v]iolation of D.C. code 48-904.01," id., which prohibits "knowingly or intentionally . . . possess[ing], with intent to . . . distribute, a controlled substance." D.C. Superior Court Judge Geoffrey Alprin approved the warrant. Id.

After this second search — which Thorp deems a "raid" — officers found approximately 4.1 grams of crystalized substances; a total of 100 capsules; a green box containing one-inch zip-top bags, each bearing numerous Batman logos; and drug paraphernalia. See Def. MSJ, Exh. 22 (Afari Crime Scene Report) at 2-6; Exh. 18 (Gamm Crime Scene Report) at 5-7; Exh. 23 (Arrest Record) at 2; Exh. 24 (Property Seizure Report: Drugs); Exh. 20 (Deposition of Jacqueline Gerrish) at 73:17-75:1 (noting MDMA — commonly known as ecstasy — is "sold on the street" in "ziplocks with Batman logos on them."). Thorp was then arrested, allegedly at Kyle's behest, see Pl. RSMF, ¶ 32, and charged with animal cruelty and possession of illegal drugs. See United States v. Thorp, No. 2015-CF2-001682. Officers also seized $53,426 in cash from the premises, and Russell impounded Plaintiff's Doberman. See Pl. RSMF, ¶¶ 31, 33. Although a laboratory test later showed the pills seized were methylenedioxy-methamphetamine (MDMA) and

etholyne, see Def. MSJ, Exh. 21 (Drug Test Results), "the United States Attorney abandoned the criminal case against" Thorp. See Pl. SMF, ¶ 114. On May 22, 2015, the D.C. Superior Court dismissed all criminal charges against him related to the February 4 search of his home. Id.

Seeking redress for these injuries, Plaintiff brought this suit against the District and Kyle. See Thorp, 142 F. Supp. 3d at 136-37. He filed his First Amended Complaint on February 15, 2015, see ECF No. 12, and added a Second Amended Complaint on July 13, 2015. See ECF No. 22. That latter Complaint, which remains the operative pleading in this case, originally advanced ten separate counts under 42 U.S.C. §§ 1983, 1985, and the common law of the District of Columbia. See ECF No. 22 (Second Amended Complaint), ¶¶ 81-133. After Defendants subsequently moved to dismiss, see ECF Nos. 23, 24, 26, the Court winnowed the claims to the following: Counts II and III against Kyle only, for limited Fourth Amendment violations; Count IV against the District only, under the D.C. common law of negligent supervision and retention; and Counts VIII and IX, consolidated into a single abuse-of-process claim, against Kyle on a direct-liability theory and against the District on a vicarious-liability theory. See Thorp, 142 F. Supp. 3d at 149.

After nearly 19 months of discovery, both parties have filed Cross-Motions for Summary Judgment. Those Motions are now ripe.

## II.    Legal Standard

"When faced with cross-motions for summary judgment, th[is C]ourt must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" Family Trust of Mass., Inc. v. United States, 892 F. Supp. 2d 149, 154 (D.D.C. 2012) (quoting Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003)) (alteration in original). If the Court determines that one party is not entitled to summary

judgment, it "changes tack on the cross motion and gives the unsuccessful movant 'all of the favorable factual inferences that it has just given to the movant's opponent.'" <u>Nucap Indus., Inc. v. Robert Bosch LLC</u>, No. 15-2207, 2017 WL 1197104, at *6 (N.D. Ill. Mar. 31, 2017) (quoting <u>R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engrs., Local Union 150</u>, 335 F.3d 643, 647-48 (7th Cir. 2003)).

Summary judgment is appropriate "only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed." <u>Airlie Foundation v. IRS</u>, 283 F. Supp. 2d 58, 61 (D.D.C. 2003) (citing <u>Rhoads v. McFerran</u>, 517 F.2d 66, 67 (2d Cir. 1975)); <u>see also</u> Fed. R. Civ. P. 56(a); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986); <u>CEI Wash. Bureau, Inc. v. DOJ</u>, 469 F.3d 126, 129 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. <u>See</u> <u>Liberty Lobby</u>, 477 U.S. at 248; <u>Holcomb v. Powell</u>, 433 F.3d 889, 895 (D.C. Cir. 2006). A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. <u>See</u> <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007); <u>Liberty Lobby</u>, 477 U.S. at 248; <u>Holcomb</u>, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." <u>Liberty Lobby</u>, 477 U.S. at 255; <u>see also</u> <u>Mastro v. PEPCO</u>, 447 F.3d 843, 850 (D.C. Cir. 2006). The Court must "eschew making credibility determinations or weighing the evidence." <u>Czekalski v. Peters</u>, 475 F.3d 360, 363 (D.C. Cir. 2007). To defeat summary judgment, however, an opposition must be

supported by affidavits, declarations, or other competent evidence, setting forth specific facts

showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v.

Catrett, 477 U.S. 317, 324 (1986). The non-movant is required to provide evidence that would

permit a reasonable jury to find in its favor. Laningham v. Navy, 813 F.2d 1236, 1243 (D.C. Cir.

1987). If the non-movant's evidence is "merely colorable" or "not significantly probative,"

summary judgment may be granted. Liberty Lobby, 477 U.S. at 249-50.

## III.    Analysis

Although every dog may have its day, not every plaintiff gets a trial. To pursue a Fourth

Amendment claim under section 1983, he must satisfy two criteria. First, he must establish a

jury question on a predicate constitutional violation, such as an unreasonable search or an

unreasonable seizure. See Pearson v. Callahan, 555 U.S. 223, 232 (2009). Even should he

succeed, "the protection of qualified immunity is available if 'a reasonable officer could have

believed that [his or her actions were] lawful, in light of clearly established law and the

information the officers possessed.'" Youngbey v. March, 676 F.3d 1114, 1117 (D.C. Cir. 2012)

(quoting Wilson v. Layne, 526 U.S. 603, 615 (1999)). One "important purpose" of the doctrine

is protecting "officials, not simply from liability, but also from standing trial." Johnson v. Jones,

515 U.S. 304, 312 (1995).

In this case, Thorp is not short on allegations, but each ultimately falters on one of those

two prongs. The Court will therefore dismiss Counts II and III. It then briefly considers — and

rejects — Plaintiff's two remaining state-law claims.

### A.    Counts II and III: "Fourth Amendment Deprivation"

The Court begins with the crux of this dispute: whether Kyle violated the Fourth

Amendment by his search of Plaintiff's home and seizure of his property. Before diving in, the

Court stresses the limited scope of the counts before it. Thorp initially brought Fourth

Amendment claims against both Kyle and the District. To hold a municipality liable under

section 1983, however, a plaintiff must allege "that [the city] maintained a policy or custom that

caused the violation of his or her constitutional rights." Thorp, 142 F. Supp. 3d at 138 (quoting

Kenley v. Dist. of Columbia, 83 F. Supp. 3d 20, 34 (D.D.C. 2015)) (emphasis omitted). In its

previous Opinion, the Court held that there were no such allegations here, such that neither

Count II nor III could proceed against the city. Id. at 139. The only remaining Fourth

Amendment claims were against Kyle, in his individual capacity, and Plaintiff thus must link any

constitutional violation to him. Id.

Since the last Opinion, Thorp's Fourth Amendment claims seem to have multiplied. To

provide him a full hearing, the Court will nonetheless read his Complaint generously and divide

Counts II and III into the following potential "sub-claims," id. at 141: (1) the original animal-

cruelty warrant application was deficient; (2) Kyle's reliance on the warrant was improper; (3)

Kyle's search exceeded the warrant's scope; (4) the second warrant, which was procured on the

basis of amphetamines discovered in Thorp's freezer, was invalid; (5) the warrantless field test

of said amphetamines was improper; (6) Thorp's arrest was without probable cause; (7) the

execution of each warrant unnecessarily caused property damage, and, finally, (8) officers

unlawfully seized more than $53,000 in cash from the apartment. It will address each in turn.

### 1. Application for First Warrant

Plaintiff initially criticizes the MPD's first warrant as "obviously deficient." Pl. MSJ at

7. Previously, the Court allowed this claim to proceed because the "Complaint clearly allege[d]

that the 'warrant was made at the behest of' Kyle." Thorp, 142 F. Supp. 3d at 141-42 (emphasis

added). It also rejected any qualified-immunity defense, as Thorp had alleged that "Kyle used

false information to obtain the animal cruelty search warrant s[o] that he could search the Plaintiff's home for illegal drugs, despite having no probable cause to believe illegal drugs would be found in the home." Id. at 142; see also id. (citing allegations that the warrant "was based solely upon . . . false statements . . . made at the behest of Kyle").

Following discovery, the sands have shifted. While Plaintiff maintains that Onoja and Rapp fabricated their report, he has seemingly abandoned any allegation that they did so at Kyle's behest. Although at times he suggests that Kyle saw the warrant before executing it, he never claims Kyle participated in its application and, indeed, chastises the officer for his "apparent refusal . . . to even review the warrant" in detail. See Pl. Reply at 12 n.5; see also id. at 39 n.15 (suggesting Kyle had discussed Thorp generally with his sergeant before February 4, 2015). In any event, to the extent Plaintiff means to blame Kyle for falsehoods in the warrant, the Court is no longer bound to accept such factual allegations as true. Rather, he must support any claim by affidavits, declarations, or other competent evidence. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Laningham v. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987). "[I]t is [his] obligation, and not this Court's, to locate and cite to the appropriate portions of the record that support [his] arguments on summary judgment." Sloan v. Urban Title Servs., Inc., 689 F. Supp. 2d 94, 99 (D.D.C. 2010). As Thorp has not done so here, the Court concludes that Kyle played no role in preparing or submitting the warrant for judicial approval.

### 2. Reliance on First Warrant

Because Kyle did not participate in the warrant application, he "had no *ex ante* reason to distrust its contents." Davis v. Dist. of Columbia, 156 F. Supp. 3d 194, 203 (D.D.C. 2016). The next question before this Court is thus "whether [he] could reasonably rely on the warrant once

signed by the judge." Id. Of course, "[i]t is incumbent on the officer executing a search warrant to ensure the search is lawfully authorized and lawfully conducted." Groh v. Ramirez, 540 U.S. 551, 563 (2004). That may be especially so for "the commander of the team of officers who executed the warrant." Pl. MSJ at 7; see also Elkins v. Dist. of Columbia, 690 F.3d 554, 568-69 (D.C. Cir. 2012) (suggesting officers who "lead the team must read the warrant and assure themselves of its sufficiency").

 At the same time, courts "have recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and . . . that in such cases those officials . . . should not be held personally liable." Anderson v. Creighton, 483 U.S. 635, 641 (1987). "In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." United States v. Leon, 468 U.S. 897, 921 (1984). "Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of [qualified] immunity be lost." Malley v. Briggs, 475 U.S. 335, 344-45 (1986). In other words, if a reasonable officer could have believed that the warrant application was valid, he is entitled to qualified immunity for executing the warrant — even if a court later deems it invalid. See Elkins, 690 F.3d at 565 (officer entitled to qualified immunity where "warrant was not facially invalid").

Thorp nonetheless maintains that the warrant here was "utterly" deficient on two grounds. See Pl. MSJ at 8. First, he makes much of the fact that the affiant officer, Ann Russell, is a member of the Washington Humane Society rather than the Metropolitan Police Department. Although he casts Russell as a mere "animal control officer," see Pl. MSJ at 3, the D.C. Code clearly authorizes "any humane officer" to obtain a search warrant when she has "reasonable

cause to believe[] that the laws in relation to cruelty to animals have been or are being violated in any particular building or place." D.C. Code § 22-1005.

Thorp counters that Russell exceeded that authority, as his <u>home</u> was not the "particular building or place" in which officers had allegedly observed him strike his dog. <u>See</u> Pl. MSJ at 2-3 (quoting D.C. Code § 22-1005). Generally, officers are not so confined, as "observations of illegal activity outside of the home can provide probable cause for the issuance of a search warrant for a suspect's house, even in the absence of an allegation that any illegal activity occurred in the home itself." <u>United States v. Thomas</u>, 989 F.2d 1252, 1254 (D.C. Cir. 1993). Even were humane officers more limited — *i.e.*, to the precise place in which "the laws . . . are being violated," D.C. Code § 22-1005 — Russell's affidavit expressly cites a "risk of further abuse" inside the home. <u>See</u> First Search Warrant at 2. She had "reasonable cause" to so believe, <u>see</u> D.C. Code § 22-1005, as officers had personally observed Thorp take the Doberman inside his home and reported that he did not return outside thereafter. <u>See</u> First Search Warrant at 2. At a minimum, the warrant was "not facially invalid," and the Court therefore cannot hold <u>Kyle</u> responsible for executing it. <u>See</u> <u>Elkins</u>, 690 F.3d at 565.

Second, Plaintiff maintains that the warrant never spoke to his "intent in striking his dog, an essential element of the animal cruelty statute." Pl. MSJ at 8 (citing D.C. Code § 22-1001(a)(1)). This argument, however, "incorrectly assume[s] that an officer must have proof of each element of a crime and negate any defense" before a search. <u>See</u> <u>Finigan v. Marshall</u>, 574 F.3d 57, 63 (2d Cir. 2009). On the contrary, "probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." <u>Illinois v. Gates</u>, 462 U.S. 213, 245 n.13 (1983); <u>see also</u> <u>Brinegar v. United States</u>, 338 U.S. 160, 173

(1949) (noting the "difference between [what] is required to prove guilt in a criminal case and what is required to show probable cause for arrest or search" is "large").

From the face of the warrant, two officers observed plaintiff "forcefully striking the doberman type dog while the dog was laying [*sic*] on the ground." Second Search Warrant at 2. "[T]he dog was yelping and screaming as if in pain while being struck." Id. Whether those facts alone prove that Thorp "knowingly . . . beat[]" his dog, see D.C. Code. § 22-1001(a)(1), they certainly provide probable cause that he did so. Perhaps, as Thorp suggests, he merely "tripped and fell on the dog" or "grappled with the dog as it attempted to bolt away." Pl. RSMF, ¶ 2. A person's "innocent explanations for his odd behavior," however, "cannot eliminate the suspicious facts from the probable cause calculus." United States v. Ali, 870 F. Supp. 2d 10, 32 (D.D.C. 2012) (quoting Ramirez v. City of Buena Park, 560 F.3d 1012, 1024 (9th Cir. 2009)). As the officer "executing [the] warrant," Kyle was not required "to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent." Baker v. McCollan, 443 U.S. 137, 145-46 (1979); see also Wampler v. Snyder, 66 F.2d 195, 196-97 (D.C. Cir. 1933) ("Disputed questions of fact, especially where they involve the question of intent, . . . should never be considered on the question of probable cause."). Plaintiff therefore cannot establish liability on that ground.

### 3. Scope of First Warrant

Next, Thorp accuses Kyle of exceeding the scope of the first search warrant. To refresh, Officers Russell and D'Eramo quickly secured Plaintiff's dog, who appeared "[e]xtremely healthy." Russell Dep. at 83:1-6. They also observed "a bag of dog food on the floor." Id. at 84:21-22. At that point, the humane officers considered their search finished and advised their MPD colleagues that "checking more significantly for dog food wasn't a priority." Id. at 87:5-9.

The Vice Unit, however, continued searching closed containers.  Nearly 30 minutes after officers

had found the dog, Kyle opened the freezer and found two unmarked zip-top bags full of pills.

Plaintiff believes that this "rummaging around in closed spaces" "vastly exceeded the

scope of the search authorized by the original . . . warrant."  Pl. MSJ at 22.  It is true, as he

argues, that "if the scope of the search exceeds that permitted by the terms of a validly issued

warrant[,] . . . the subsequent seizure is unconstitutional without more."  Wilson v. Layne, 526

U.S. 603, 611 (1999) (quoting Horton v. California, 496 U.S. 128, 140 (1990)).   Plaintiff,

however, misunderstands the scope of the first search warrant, insisting it was limited to a search

for "animals physically abused."  Pl. SMF, ¶ 39; see also Pl. MSJ at 19.  On the contrary, the

warrant plainly authorized officers to search the premise for "[a]nimals physically abused (dead

or alive)[,] bowls, water bowls, or any other evidence of animal cruelty/neglect."  First Search

Warrant.  In other words, officers could search anywhere they might find, for instance, a "dead"

animal or additional "bowls" of dog food.  The freezer was one such place.  See Russell Dep. at

89:22-90:11 ("I previously have had warrants for ho[a]rding situations where we found deceased

animals in freezers."); D'Eramo Dep. at 158:7-20 ("[T]here are times where I would open

refrigerators" during animal-cruelty searches).

Perhaps the warrant went too far in so authorizing.  A warrant, of course, "must be

tailored to the justifications for entering the home," United States v. Griffith, 867 F.3d 1265,

1276 (D.C. Cir. 2017)), but there was no indication in this case that Thorp had, for example,

engaged in any sort of "dogfighting situation," such that he was likely to store dead animals on

the premises.  See D'Eramo Dep. at 158:9-14 (noting that for "known dog-fighters," officers will

search "every nook and cranny").  Likewise, the warrant could conceivably have indicated that

once police had found some dog food — and thus alleviated any fear that the animal was

starving — they could not keep searching for other sustenance.  See Maryland v. Garrison, 480 U.S. 79, 84 (1987) (noting warrants should not allow "wide-ranging exploratory searches").

The Court need not decide, however, whether the warrant was overly broad.  Even assuming *arguendo* that it was, qualified immunity would apply.  As explained above, it is ordinarily "the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment."  Leon, 468 U.S. at 921.  Although authorization to search for "animals . . . (dead or alive)" may have been a mismatch for the allegations at hand, it was not beyond the pale in a suspected animal-cruelty case.  All told, Kyle's "judgment that the scope of the warrant was supported by probable cause may have been mistaken, but it was not 'plainly incompetent.'" Messerschmidt v. Millender, 565 U.S. 535, 553 (2012) (quoting Malley, 475 U.S. at 341).

That is so regardless of Kyle's subjective motivation for searching the freezer.  Thorp claims that the Vice Unit "believed [him] to be drug dealing," and the animal-cruelty allegations were little more than a Potemkin village.  See Pl. RSMF, ¶ 14; see also Pl. MSJ at 43.  Officer D'Eramo, too, thought it was "definitely . . . a possibility" that the humane officers "got played" by the MPD.  See Pl. MSJ at 25 (citing D'Eramo Dep. at 141-142); see also Kyle Dep. at 126:3-7 (noting that he had discussed the "scope" of the warrant at roll call and advised that "if anybody had found any drugs or anything like that, we were to stop and apply for another search warrant").  At other points, Thorp variously suggests that Kyle harbored personal animus against him because of their entangled romantic history, see Pl. Reply at 27, or that the MPD sought to deter him from executing an unrelated civil judgment against ANC Henderson.  Id. at 40; see also Thorp, 142 F. Supp. 3d at 135-36 (discussing these allegations in detail).

Even were those allegations true, however, they would be immaterial. "[Q]ualified immunity does not turn on whether an officer is motivated by good intentions or malice." Messerschmidt, 565 U.S. at 571; see also Crawford-El v. Briton, 523 U.S. 574, 588 (1998) ("[A] defense of qualified immunity may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated. Evidence concerning the defendant's subjective intent is simply irrelevant to that defense."). Rather, "[t]he fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by the terms of a warrant." Horton, 496 U.S. at 138. This search was so confined, and the Court, accordingly, grants summary judgment to Kyle on the application for, reliance on, and execution of the first warrant.

### 4. *Sufficiency of Second Warrant*

Next up is the second warrant. Upon finding the capsules, Kyle purportedly recognized them as MDMA and believed "the amount . . . found in the freezer [was] more consistent with intent to distribute and not mere personal use." Second Search Warrant Aff. at 2. The "search was immediately halted," save for a field test discussed in more detail below. See Def. SMF, ¶ 26; Pl. RSMF, ¶ 26. Kyle then called his colleagues, who in turn applied for a second search warrant of Thorp's home, this time for "[n]arcotics, drug packaging material, scales, [c]utting tools, books, records, . . . and cash proceeds." Second Search Warrant. Thorp challenges the sufficiency of this warrant, too, but the Court finds none of his attacks persuasive.

First, he posits that Kyle improperly secured the second warrant "based solely on information he himself illegally obtained." Pl. MSJ at 42. In other words, he argues that "[i]f Kyle exceeded the scope of Russell's search warrant, he could not use the evidence purportedly obtained to provide a basis for a *ex post facto* second warrant." Id. The Court has held,

however, that Kyle could have reasonably believed he had authority to search the freezer. See Section III.A.3, *supra*. From there, it would be equally reasonable to obtain a warrant based on its contents. In any event, "[t]he fruit of the poisonous tree doctrine does not apply to § 1983 cases." Elkins v. Dist. of Columbia, 610 F. Supp. 2d 52, 61 n.7 (D.D.C. 2009). Rather, that doctrine "is an evidentiary rule that operates in the context of criminal procedure," and the Supreme Court has repeatedly refused to extend it to non-criminal contexts, such as civil tax proceedings, habeas proceedings, grand-jury proceedings, deportation proceedings, and parole-revocation hearings. See Townes v. City of New York, 176 F.3d 138, 145-46 (2d Cir. 1999) (collecting cases). Put more plainly, even were a court to suppress the pills found in Plaintiff's freezer in a criminal proceeding, Kyle would not face any additional civil liability solely because he obtained a second warrant based on that discovery.

Second, Plaintiff questions whether the capsules were actually in plain view when Kyle opened the freezer. Under the plain-view doctrine, "if police are lawfully in a position from which they view an object [and] its incriminating character is immediately apparent," Minnesota v. Dickerson, 508 U.S. 366, 375 (1993), "neither its observation nor its seizure would involve any invasion of privacy." Horton, 496 U.S. at 133. In his Response to Defendants' Statement of Material Facts, Thorp alleges that the pills were actually "folded up in a baggie," such that "their appearance could not be discerned without moving them." Pl. RSMF, ¶ 21. The theory, the Court presumes, is that a cursory look into the freezer would have revealed the absence of any dead animals, meaning the officers could not otherwise examine the contents being chilled.

Plaintiff does not press these allegations in his briefing and for good reason. He bases his accusation on two crime-scene photographs: one in which the pills are readily visible (top), and

one, which he claims was "intentionally withheld from [him] for more than a year," that shows the capsules "obscured" from plain view (bottom):





Id.; Def. MSJ, Exh. 22; Pl. Reply, Exh. DDD (alterations added).

Although the Court must ordinarily view the facts "in the light most favorable to the non-moving party," . . . it need not do so when such an assertion relies on "visible fiction." Scott v.

Harris, 550 U.S. at 372, 380-81 (2007) (holding that when evaluating section 1983 claim for excessive force, lower court "should have viewed the facts in the light depicted by [a] videotape" of the incident). Here, Plaintiff's own photographic evidence belies his claims that the pills were obscured, as the Court can clearly make out the same clear plastic baggies with pills in both pictures.

Nor, contrary to Plaintiff's aspersions, is there evidence that the District purposely suppressed the second crime-scene photograph during discovery. See Pl. RSMF, ¶ 21. True, the city initially turned over only the first photograph, apparently taken during the execution of the second warrant. When Plaintiff presented that photograph during Kyle's deposition, however, the officer forthrightly responded that he recalled the capsules "being closer to [the Christmas sage] box . . .when [he] first saw them." Kyle Dep. at 113:1-2. Given that voluntary admission, the Court is loath to suspect foul play.

Third, assuming the capsules were visible, Thorp still questions whether Kyle would have recognized them as illicit. More specifically, he asks "how the appearance or presentation of unmarked capsules in the Plaintiff's freezer differed in appearance whatsoever from the multitude of equally unmarked nutritional supplements foisted upon [his] attorney by [the attorney's] girlfriend at breakfast each morning." Pl. Reply at 22. Kyle explained, however, that the pills in Thorp's freezer "appeared to be packaged in the same manner that we purchase them in the District of Columbia as a vice unit." Kyle Dep. at 115:17-20. Further, he "readily" recognized the "clear capsule[s] containing a light colored powder" as "MDMA or commonly known as molly." Id. at 115:19-20, 118:8-9. Although Thorp criticizes Kyle's reliance on his "training" and "experience" to identify the pills, Kyle's affidavit was a far cry from merely incanting the "habits" of drug dealers. See S.H. v. Dist. of Columbia, 270 F. Supp. 3d 260, 265,

268 (D.D.C. 2017). Rather, Kyle had already observed the drugs themselves and appropriately relied on his "training" to recognize them as such.

Fourth and finally, Plaintiff alleges that Kyle intentionally omitted "that Thorp had the prescription for amphetamine capsules" in his warrant application. See Pl. MSJ at 43. The parties agree that Thorp had prescriptions for two different amphetamine salts on February 4, 2015, "one of round pink tablets manufactured by Core Pharmaceuticals, the other of orange-and-white capsules manufactured by Global Pharmaceuticals." Def. SMF, ¶ 24; see also Pl. RSMF, ¶ 24. Plaintiff insists that Kyle knew of those prescriptions because he was present in "the room where the prescription bottles were in plain view." Pl. SMF, ¶ 77 (citing Kyle Dep. at 126-127).

Even crediting that accusation, the omission of Thorp's prescriptions from the affidavit did not render it invalid. As Kyle later explained, he could confidently distinguish the pills from prescribed pharmaceuticals "because medication such as generic Adderall that's prescribed by a doctor that you get in a pharmacy is required to have a . . . manufacturer's mark and an identification number." Kyle Dep. at 174:18-175:2. By contrast, the pills "found inside the freezer . . . [did not] have those markings. Id. at 175:3-5; see also Gerrish Dep. at 70:22-71:10 (prescription pills "are supposed to be stored in the container at all times"). If, as Plaintiff alleges, Kyle examined the prescription pill bottles, he still could have readily distinguished the "round pink tablets" and "orange-and-white" capsules from the unmarked ones found inside the freezer.

Thorp maintains that in his "frequent and lengthy Asian travels" he might have obtained unmarked Adderrall pills, see Pl. Reply 26 at n.10 ("It is not known to anyone involved herein what is passed off to tourists as Adderrall."). Once again, however, such "innocent explanations

for his odd behavior" — even if Kyle could be presumed to know how visitors to Bangkok might obtain pharmaceuticals — "cannot eliminate the suspicious facts from the probable cause calculus." Ramirez, 560 F.3d at 1024. At bottom, "the standard is probable cause," and this Court "cannot say that the omitted facts individually or together negate the fair probability that [Plaintiff] was a dealer." United States v. Spencer, 530 F.3d 1003, 1008 (D.C. Cir. 2008) (quotation omitted).

### 5. Field Test

Before obtaining the second warrant, the officers, at Kyle's direction, also field tested the capsules found in the freezer. See Kyle Dep. at 115:7-9. Leaving no stone unturned, Thorp challenges this field test as a separate warrantless search. Although, as just explained, the test was not necessary to establish probable cause for the second warrant, the Court will nevertheless consider whether Plaintiff might obtain nominal damages from any such violation.

The Supreme Court has expressly held that a chemical field test that "merely disclose[d] whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy." United States v. Jacobsen, 466 U.S. 109, 123 (1984). The D.C. Circuit, too, has stressed that such a field test is "not a search within the meaning of the Fourth Amendment." United States v. Colyer, 878 F.2d 469, 472 (D.C. Cir. 1989). Following that lead, Kyle categorizes this field test as outside the Fourth Amendment's purview, such that he would not need not a warrant — or even probable cause — to perform it. See Def. MSJ at 15-16 (citing Illinois v. Caballes, 543 U.S. 405, 408 (2005); Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 653 (1995) ("[W]hen a warrant is not required (and the Warrant Clause [is] therefore not applicable), probable cause is not invariably required either.")).

Thorp retorts, with some force, that a field test for amphetamines implicates different privacy interests. In Jacobsen, the Court found significant that the test could "reveal nothing about noncontraband items." 466 U.S. at 124 n.24. By contrast, Thorp alleges that this "field test could not discriminate between [his] prescribed medications and any kind of contraband," as "methamphetamine and Adderrall are essentially the same drug." Pl. Reply at 26 n.10 (quoting Patrick Winn, "Myanmar's state-backed militias are flooding Asia with meth," GlobalPost (Nov. 12, 2015); id. ("[I]f Adderral is Bombay Sapphire, meth is bathtub gin."). If this field test could indeed reveal the presence of prescription drugs, it would likely fall outside Jacobsen's purview.

Even were that so, however, qualified immunity would still shield Kyle from civil liability. That doctrine applies so long as an officer's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). A right is "sufficiently clear" when "every reasonable official would have understood that what he is doing violates that right." Reichle v. Howards, 566 U.S. 658, 664 (2012) (internal quotation marks and alteration omitted). While the Supreme Court does "not require a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al–Kidd, 563 U.S. 731, 741 (2011). "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that [i]t is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (internal quotation marks omitted).

Here, the most relevant Supreme Court precedent allowed officers to conduct warrantless field tests of a suspected drug. See Jacobsen, 466 U.S. at 122-23. While this Court might not

extend that holding to amphetamines, other courts have done so without hesitation. The Fifth

Circuit, for instance, believed "<u>Jacobsen</u> squarely held that field tests which can only detect that

a substance is a particular drug (be it cocaine or methamphetamine), but cannot detect what that

substance is if the test results are negative, are not searches." <u>United States v. Parks</u>, 119 Fed.

App'x 593, 599 (5th Cir. 2004); <u>see also</u> <u>Hackett v. Artesia Police Department</u>, 2009 WL

10681494, at *2, *9 (D.N.M. Sept. 23, 2009) (holding officer's "amphetamine or

methamphetamine field-test" was "not actionable under the Fourth Amendment because a

chemical test for illegal drugs [] is not recognized as a 'search'"); <u>People v. Leichty</u>, 205 Cal.

App. 3d 914, 918, 922 (Cal. Ct. App. 1988) (noting that officer's field test "for amphetamines"

"cannot be characterized as a search subject to the Fourth Amendment"). Plaintiff, meanwhile,

cites no cases to the contrary. Far from placing the constitutional question "beyond debate," the

"existing precedent" in this area <u>supported</u> Kyle's field test for amphetamines. <u>See</u> <u>Ashcroft</u>,

563 U.S. at 741   The Court cannot hold him liable for following conventional wisdom.

### 6. *False Arrest*

After officers finished the second search, they arrested (and ultimately charged) Thorp on

two grounds: (1) possession with intent to distribute a controlled substance and (2) animal

cruelty. The humane officers on the scene also impounded his dog for 14 days (during which

time Plaintiff alleges the Doberman was injured). Thorp now challenges each seizure for lack of

probable cause.

"Where, as here, a false arrest claim is based on a warrantless arrest, the defendant

officers must establish probable cause to arrest." <u>Wardlaw v. Pickett</u>, 1 F.3d 1297, 1304 (D.C.

Cir. 1993); <u>see also</u> <u>Martin v. Malhoyt</u>, 830 F.2d 237, 262 (D.C. Cir. 1987) ("It is well settled

that an arrest without probable cause violates the [F]ourth [A]mendment."). "An arrest is

supported by probable cause if, 'at the moment the arrest was made, . . . the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that the suspect has committed or is committing a crime." Wesby v. Dist. of Columbia, 765 F.3d 13, 19 (D.C. Cir. 2014), reversed on other grounds by Dist. of Columbia v. Wesby, 138 S. Ct. 577 (2018) (modifications in original) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)).

After executing the second warrant, the MPD officers found 100 capsules, which they recognized as MDMA, along with crystallized substances, all in unmarked plastic bags. The officers also found drug paraphernalia suggesting an extensive distribution operation. See Afari Crime Scene Report at 2-6; Gamm Crime Scene Report at 5-7; Arrest Record; Property Seizure Report: Drugs. Together, the evidence "certainly suggested criminal activity" to a reasonable officer, see Wesby, 138 S. Ct. at 589, and Kyle thus had probable cause to arrest Thorp on charges of possession with intent to distribute. Given that the arrest was "legally justified" on that ground, the Court need not decide whether he independently had probable cause to arrest Thorp on grounds of animal cruelty. Enders v. District of Columbia, 4 A.3d 457, 467 (D.C. 2010) ("[A] defendant can defeat a false arrest claim by showing the arrest was legally justified. Legal justification to effect a warrantless arrest, in turn, means [here] probable cause to believe a felony has been committed.").

The seizure of Plaintiff's Doberman poses slightly thornier issues. The District argues that the humane officers would have impounded the dog regardless of the charges, see Def. SMF, ¶ 30, as they "may take possession of any animal to protect it from neglect or cruelty." D.C. Code § 22-1004(b)(1). The Court agrees that, at least initially, the officers could do so regardless of the exact charges against Thorp. After all, they knew Thorp was the sole owner of

the Doberman and were loath to leave the dog abandoned in his absence.  But to the extent that

the humane officers kept the Doberman <u>after</u> his release, Thorp finds more traction.  It is unclear

exactly when Plaintiff left custody, <u>see</u> ECF No. 93-1 (Declaration of Mark Thorp), ¶ 26

(alleging that he was subject to "regular appearances before pre-trial authorities" for three

months).  Assuming he was released within 14 days, the Humane Society would have had little

reason to keep the Doberman but for the animal-cruelty charges.

Plaintiff attributes these charges to Kyle, alleging that he told the humane officers that

"Mr. Thorp was being arrested for animal cruelty."  Pl. MSJ at 25 (citing Russell Dep. at 99-

100).  Regardless of whether Kyle actually had probable cause to press such charges, however,

qualified immunity spares him once more.  To refresh, Kyle believed — as Officers Rapp and

Onoja reported — that Thorp had "forcefully struck" his dog.  At that point, Kyle also knew that

a neutral magistrate had found probable cause to search the home.  While the search did not

unearth any new evidence of animal cruelty, a reasonable officer could assume that there were

still sufficient grounds for arrest.  Even were that assumption faulty, it was not so "plainly

incompetent" as to trigger civil liability.  <u>See</u> <u>Malley</u>, 475 U.S. at 341.

### 7. *Property Damage from Execution of Search Warrants*

In its prior Opinion, the Court allowed that "insofar as Count III alleges that the second

search was conducted unlawfully, it . . . may proceed."  <u>Thorp</u>, 142 F. Supp. 3d at 143.  In his

summary-judgment briefing, however, Thorp does not seem to renew any such allegations.  At

times, his statement of material facts suggests that both the first and second warrants may have

been executed improperly, such that his property was damaged.  <u>See</u> Pl. SMF, ¶ 53 (noting

officers used "battering rams and pry bars" to force entry); <u>id.</u>, ¶ 159 ("Plaintiff's home and

personal property were substantially damaged by the raid.").   But neither his memorandum

supporting his Motion for Partial Summary Judgment nor his opposition to the District's Motion includes any mention of those grievances.

To the extent Thorp means to press a challenge on these particular grounds (as opposed to, say, establish damages for his other claims), he has failed to do so properly. Local Civil Rule 7(a) requires that all motions for summary judgment be accompanied by "a statement of the specific points of law and authority that support the motion." "The purpose of the rule is to ensure that the nonmovant and the court are provided notice of what is sought and the legal basis for the motion." Abdah v. Bush, 2008 WL 114872, at *1 n.2 (D.D.C. 2008); see also Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner, 101 F.3d 145, 151 (D.C. Cir. 1996) ("[A] district court should not be obliged to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make [its] own analysis and determination of" the disputed claims). Because Thorp's "briefing inadequately addresses" any claim related to property damage from execution of the warrants, the Court "will not decide [the] matter" here. See Catalyst & Chemical Services, Inc. v. Global Ground Support, 350 F. Supp. 2d 1, 20 n.18 (D.D.C. 2004); see also Schoenman v. FBI, 857 F. Supp. 2d 76, 82 n.6 (D.D.C. 2012) (declining to consider issue when plaintiff failed "to set forth the entire basis for his motion in his supporting memorandum"); United States v. Wade, 992 F. Supp. 6, 21 (D.D.C. 1997) (refusing to address an argument, briefly raised, but for which "absolutely no legal, factual, or rhetorical support" was offered); cf. Carducci v. Regan, 714 F.2d 171, 177 (D.C. Cir. 1983) (refusing to entertain an "'asserted but unanalyzed' argument").

### 8. *Seizure of Currency*

Thorp, conversely, does devote nearly a third of his brief to the seizure of $53,426 in cash from his home. See Pl. MSJ at 28-41. Kyle originally confiscated the currency, believing it was

"possibly [the] proceeds from the possession with intent to distribute illegal drugs." Kyle Dep. at 137:4-138:7. The District, however, has since returned the funds, and what remains of this controversy (if anything) is not properly before the Court. Thorp raised similar claims in a previous Motion for Partial Summary Judgment, but the Court warned him that it could not "identi[fy] the count on which he would like the Court to grant summary judgment." Thorp, 142 F. Supp. 3d at 148. "While the Motion contend[ed] that the District seized an amount of cash in excess of $53,000," the Court explained that "neither that figure nor any other particular amount of currency appears anywhere in the Complaint." Id.

Nearly two years later, nothing has changed. Although Thorp moved to file a supplemental complaint with related allegations, the Court denied that request in a separate Opinion, explaining that such a vehicle was improper for "events that occurred prior to" the filing of his Second Amended Complaint. See ECF No. 49 at 5 (noting Rule 15(d) allows parties to supplement the operative pleading "with any facts that occurred after the initial pleading was filed") (emphases altered). Despite multiple invitations by this Court to amend his Complaint with such allegations, id. at 10; see also Minute Order of Dec. 15, 2015, Thorp has declined to do so. As such, the operative Complaint makes no mention of the missing $53,000, and any related dispute thus falls outside the current lawsuit. See Jo v. Dist. of Columbia, 582 F. Supp. 2d 51, 64 (D.D.C. 2008) ("It is well-established in this district that a plaintiff cannot amend his Complaint in an opposition to a defendant's motion for summary judgment.").

B.  State-Law Claims

Having forded the morass of constitutional issues in his section 1983 counts, the Court arrives at last at the shores of Thorp's remaining state-law claims for (1) negligent supervision and retention and (2) abuse of process. While it has already granted judgment on his federal

counts, "[a] district court may choose to retain jurisdiction over . . . pendent state law claims after federal claims are dismissed." Shekoyan v. Sibley Int'l, 409 F.3d 414, 423 (D.C. Cir. 2005). Given the length this suit has been pending here, its complexity, and the Court's familiarity with the parties and issues, it finds that resolving the related common-law counts strikes the appropriate balance among "judicial economy, convenience, fairness, and comity." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 & n.7 (1988).

### 1. Count IV: "Negligent Supervision/Negligent Retention"

"D.C. case law does not appear to distinguish between negligent supervision and negligent retention." Islar v. Whole Foods Mkt. Grp., Inc., 217 F. Supp. 3d 261, 265 n.1 (D.D.C. 2016) (citing cases); see also Phelan v. City of Mount Rainier, 805 A.2d 930, 937 (D.C. 2002). To prevail on either claim, a plaintiff must show an employer "knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee." Dist. of Columbia v. Tulin, 994 A.2d 788, 794 (D.C. 2010) (quoting Giles v. Shell Oil Corp., 487 A.2d 610, 613 (D.C. 1985)); see also Rawlings v. Dist. of Columbia, 820 F. Supp. 2d 92, 115 (D.D.C. 2011) ("Plaintiff must show. . . that [Kyle] engaged in behavior before the [search of Thorp's home] that should have put his employer on notice that he required additional training.").

Thorp falls far short of that benchmark here. To establish the District's liability, he relies on two previous incidents involving Kyle, one from September 7, 2005, and another from February 23, 2007, nearly three years before Kyle's promotion to sergeant and nearly eight years before the searches of Plaintiff's home. Neither helps his cause. First, he cites United States v. Dubose, 2006 WL 1030154 (D.D.C. Apr. 19, 2006), in which Judge John Bates of this court

suppressed evidence from the search of a green Lexus. There is no record, however, that Kyle was involved in the searches of the car. On the contrary, the opinion criticized "Officer Jones" for searching the car without any "readily identifiable" nexus to crime. Id. at *8. At most, the Court might assume that Judge Bates mistakenly referred to Kyle by his first name, and he is the "Officer Ramey" who participated in the valid warrantless search of Dubose's person. See Dubose, 2006 WL 1030154, at *2, *5-*6. That decision made clear, however, that "[n]either the green Lexus nor Officer Jones were visible to . . . Officer Ramey from where [he was] located at" the time of the unconstitutional car search. Id. at *2.

Thorp's reliance on Dormu v. District of Columbia, 795 F. Supp. 2d 7 (D.D.C. 2011), is equally misplaced. He alleges that "the District of Columbia had to settle a civil rights claim brought by a surgeon from New Jersey who unjustly suffered abuse and injury at the hands of Kyle and several others." Pl. Reply at 33. As an initial matter, however, there was no admission of guilt or liability by anyone in that case; the court was simply required to "accept at th[at] stage in the proceedings" the truth of those allegations. Dormu, 795 F. Supp. 2d at 15. More to the point, the court expressly noted that there were no "facts to suggest that . . . Kyle . . . violated Dormu's rights." Id. at 23, 28, 31 n.19, 32-33, 34 ("Dormu has not provided any evidence to suggest that [Kyle was] involved in the application of the handcuffs or heard his complaints about the tightness of the cuffs."). At bottom, Kyle's mere proximity to two allegedly unconstitutional searches — nearly eight years before the alleged incident — does not constitute a pattern of "dangerous or otherwise incompetent" behavior for which the District can be held responsible.

## 2.  Counts VIII and IX: *"Abuse of Process"*

That leaves Thorp's claim for abuse of process.  Previously, the Court consolidated

Counts VIII and IX into a single abuse-of-process count, allowing it to proceed on a direct-

liability theory as to Kyle and a vicarious-liability theory as to the District.  It now grants

summary judgment on that consolidated count.

To state a claim for abuse of process, Plaintiff must establish "two essential elements

. . . : '(1) the existence of an ulterior motive; and (2) an <u>act</u> in the use of process other than such

as would be proper in the regular prosecution of the charge.'"  <u>Hall v. Hollywood Credit</u>

<u>Clothing Co.</u>, 147 A.2d 866, 868 (D.C. 1959).  Unlike a Fourth Amendment claim, an officer's

subjective intentions matter, <u>see</u> <u>Scott v. Dist. of Columbia</u>, 101 F.3d 748, 756 (D.C. Cir. 1996),

and probable cause is not enough to escape liability.  <u>See</u> <u>McCarthy v. Kleindienst</u>, 741 F.2d

1406, 1414 (D.C. Cir. 1984).  Still, "there is no action for abuse of process when the process is

used for the purpose for which it is intended," even if there "is an incidental motive of spite or an

ulterior purpose of benefit to the defendant."  <u>Id.</u> (citation omitted).

In his Complaint, Plaintiff challenges only two "act[s] in the use of process" — Kyle's

arrest of him and seizure of his property.  <u>See</u> SAC, ¶¶ 125-26, 130 (variously alleging Kyle

conducted such arrest "to retaliate against the Plaintiff for his civil claims against Henderson" or

"because of some animosity caused by Kyle's and Plaintiff's relationship history with the same

woman").  Neither action, however, could properly form the basis of an abuse-of-process claim.

The D.C. Circuit has noted expressly that "warrantless arrests and detentions effectuated entirely

<u>independent</u> of the judicial process could not support an abuse of process tort claim."  <u>McCarthy</u>,

741 F.2d at 1414 & n.9 (declining to certify class when unclear whether all putative members

were "victimized by abuses of the judicial process").  The same is true for property seized

without proper authority.  After all, "the tort evolved as a 'catch-all' category to cover improper uses of the judicial machinery."  Barquis v. Merchants Collection Ass'n, 7 Cal. 3d 94, 104 n.4, (Cal. 1972) (emphasis added).  While Kyle's warrantless actions may fall under another tort (say, false arrest), they cannot sustain an abuse-of-process claim.

In his briefing, Thorp shifts gears, criticizing Kyle for "pursuing these bizarrely unsupportable animal cruelty claims in an overblown dynamic entry search warrant."  Pl. Reply at 39.  While an application for a warrant can qualify as abuse of process, Thorp has barked up the wrong tree by bringing such count against Kyle.  As explained earlier, the evidence indicates only that Officers Onoja and Rapp may have fabricated the animal-cruelty allegations; any theory of direct liability against Kyle on that basis must therefore fail.

So, too, for his theory of vicarious liability.  His Complaint sought only to hold the District responsible for Kyle's actions, so the city's liability rises and falls with that of its Lieutenant.  In any event, even were the Court to hold the District responsible for its other officers, the Complaint is silent as to Onoja's and Rapp's motivation.  At most, those officers may have suspected Plaintiff of dealing drugs.  For an abuse-of-process claim to prevail, however, plaintiff must show, "in addition to ulterior motive, . . . a 'perversion of the judicial process and achievement of some end not contemplated in the regular prosecution of the charge.'"  Scott, 101 F.3d at 756 (quoting Morowitz v. Marvel, 423 A.2d 196, 198 (D.C. 1980)).  There is thus no cause of action when "officers institute[] [a] criminal [proceeding] for precisely the purpose for which it was intended: establishing that [the plaintiff] was guilty of a criminal offense."  Id.  Whether Onoja and Rapp thought Thorp guilty of animal cruelty or of drug dealing, their application for a search warrant thus did not abuse process.  The Court therefore

has no basis to hold the District vicariously liable for their actions, and it must grant judgment on this last count, too.

## IV. Conclusion

For the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment and deny Plaintiff's Cross-Motion for Partial Summary Judgment. The Court will issue a contemporaneous Order to that effect this day.


/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: May 24, 2018