**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

**MARK THORP,**

     **Plaintiff,**

        **v.**

**THE DISTRICT OF COLUMBIA,** *et al.*,

     **Defendants.**

             **Civil Action No.  15-195 (JEB)**

---

**MEMORANDUM OPINION**

In a May 24, 2018, Opinion, this Court granted summary judgment to Defendants District

of Columbia and a police officer on claims arising from the search of Plaintiff Mark Thorp's

home and the subsequent seizure of his Doberman Pinscher.  In now seeking reconsideration,

Thorp contends that the Court committed numerous errors in its analysis of his constitutional and

common-law claims.  Although Plaintiff spends thirty pages describing his many criticisms of

the prior Opinion's findings (as well as launching a variety of *ad hominem* attacks on Defendants

and the Court), he demonstrates no cause for reconsideration under the requirements of Rule

59(e).

**I.     Background**

Given that the Court has already described this suit at length in a couple of prior

Opinions, see Thorp v. D.C. (Thorp I), 142 F. Supp. 3d 132 (D.D.C. 2015); Thorp v. D.C. (Thorp

II), 2018 WL 2364291 (D.D.C. May 24, 2018), it will include only a brief summary of the facts

and procedural history below.

This case arose out of events that took place over three years ago, when Lieutenant

Ramey Kyle of the Metropolitan Police Department executed a search warrant of Plaintiff's

home.  Although the initial warrant was predicated on an allegation of animal cruelty committed by Thorp against his dog, an inspection of his freezer during the search revealed substances that tested positive for amphetamines.  Following that discovery, Kyle sought an additional search warrant and subsequently arrested Plaintiff on charges of animal cruelty and possession with intent to distribute illegal drugs.

Aggrieved by the search of his home and the seizure of his dog, Thorp brought this suit against the District and Kyle.  See Thorp I, 142 F. Supp. 3d at 136-37.  He filed his First Amended Complaint on February 15, 2015, see ECF No. 12, and added a Second Amended Complaint on July 13, 2015.  See ECF No. 22 (Second Amended Complaint).  That latter Complaint, which remains the operative pleading in this case, originally advanced ten separate counts under 42 U.S.C. §§ 1983, 1985 and the common law of the District of Columbia.  Id., ¶¶ 81-133.  After Defendants subsequently moved to dismiss, see ECF Nos. 23, 24, 26, the Court winnowed the claims to the following: Counts II and III against Kyle only, for limited Fourth Amendment violations; Count IV against the District only, under D.C. law for negligent supervision and retention; and Counts VIII and IX, consolidated into a single abuse-of-process claim, against Kyle on a direct-liability theory and against the District on a vicarious-liability theory.  See Thorp I, 142 F. Supp. 3d at 149.   Both sides subsequently filed cross-motions for summary judgment and, on May 24, 2018, the Court granted Defendants'.  See Thorp II, 2018 WL 2364291.  The next month, Plaintiff filed the instant Motion for Reconsideration, which Defendants subsequently opposed.  See ECF Nos. 119 (Mot. for Recon.), 121 (Def. Opposition).  Although Plaintiff filed no reply, the Motion is ripe for review.

## II.      Legal Standard

Federal Rule of Civil Procedure 59(e) permits the filing of a motion to alter or amend a judgment when such motion is filed within 28 days after the judgment's entry.  The Court must apply a "stringent" standard when evaluating Rule 59(e) motions.  See Ciralsky v. CIA, 355 F.3d 661, 673 (D.C. Cir. 2004).  "A Rule 59(e) motion is discretionary and need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  Firestone v. Firestone, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (internal quotation marks and citation omitted); see also 11 C. Wright & A. Miller, Fed. Prac. & Proc. Civ. § 2810.1 at 158-62 (3d ed. 2012) (stating that "four basic grounds" for Rule 59(e) motion are "manifest errors of law or fact," "newly discovered or previously unavailable evidence," "prevent[ion of] manifest injustice," and "intervening change in controlling law").  Critically, Rule 59(e) "is not a vehicle to present a new legal theory that was available prior to judgment."  Patton Boggs LLP v. Chevron Corp., 683 F.3d 397, 403 (D.C. Cir. 2012).

## III.     Analysis

In seeking reconsideration, Thorp launches a fusillade of attacks on the Court's prior Opinion.  Although certain of his arguments are difficult to parse, the Court believes it most efficient to begin with two threshold disputes – Thorp's filing of depositions and the application of qualified immunity with respect to Defendant Kyle – before moving on to Plaintiff's more specific grievances.

### A.  Depositions

Thorp's Motion asserts that the Court improperly "proceed[ed] to judgment without at least some effort to obtain [deposition] transcripts or even a cursory mention to the parties of

their absence." Mot. at 6. The Court had noted in the prior Opinion that "Thorp does not attach copies of the depositions to which he cites," and that it was therefore "rely[ing], when available, on the excerpts of those depositions provided by Defendants." Thorp II, 2018 WL 2364291, at *1. Thorp now claims that he "provided all deposition transcripts to this Court at the time of filing Plaintiff's summary judgment motion," Mot. at 2, attaching as proof Postal Service records demonstrating that a compact disk was sent to chambers. See Mot., Exhs. 2 (Shipping Label Receipt); 3 (Package Tracking Printout). He also notes that his "forty-five-page memorandum in support of the Motion for Summary Judgment contained over four hundred lines of deposition excerpts," Mot. at 6, a fact he asserts should have put the Court on notice of the need to procure the depositions, regardless of whether it in fact received the CD allegedly containing such materials. The District responds that none of Thorp's arguments related to the depositions justifies reconsideration, as "Defendants' briefing engaged with all the lines plaintiff cited, filed or not," and that they "prevailed because the record supported their position, not because of Plaintiff's clerical errors." Opp. at 4-5.

The Court agrees with the District. It first notes that while Thorp's printout of the package tracking may state "delivered," no compact disk of depositions ever made its way to chambers. The Court need not linger here because any delivery failure is of no moment. The Court was able to review all relevant depositions either by relying on Thorp's admittedly voluminous in-text quotations or, where available, by looking to Defendants' exhibits. To the extent Plaintiff meant to rely on other portions of the depositions existing on the elusive CD, it was his obligation to have cited them during briefing. See Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner, 101 F.3d 145, 151 (D.C. Cir. 1996) ("[A] district court should not be obliged to sift through hundreds of pages of depositions, affidavits, and interrogatories in

4

order to make [its] own analysis and determination of" the disputed claims). It was no "clear error" or "manifest injustice" for the Court to consider only those excerpts of the depositions relied upon and cited by Plaintiff – whether the source of such materials came from his own filings or Defendants' exhibits.

B. Qualified Immunity

Thorp next sets his sights on the qualified-immunity analysis in the prior Opinion. He asserts that the Court improperly granted such immunity to Defendant Kyle because "government officials are not entitled to [this] immunity for intentional constitutional violations" and because the "Court improperly usurp[ed] the duty of the jury to determine probable cause and the reasonableness of Kyle's actions." Mot. at 6-7, 12 n.4. The District retorts that such arguments are merely a rehashing of those in Plaintiff's motion for partial summary judgment, and, "[t]o the extent [he] raises new arguments . . . in discussing qualified immunity[,] . . . those arguments do not warrant the Court's consideration both because they are unavailing . . . and because they 'could have been raised prior to the entry of judgment.'" Opp. at 2-3.

Turning first to the proper role of the Court, the D.C. Circuit has explained that "whether an objectively reasonable officer would have believed his conduct to be lawful" – *i.e.*, whether he is entitled to qualified immunity – "is a question of <u>law</u> that must be resolved by the court, not the jury." Pitt v. District of Columbia, 491 F.3d 494, 509-10 (D.C. Cir. 2007) (emphasis added). It is thus clear that there was no improper "usurpation" in the Court's determining whether Kyle was entitled to such a defense.

Nor was there any error in the Court's analysis of the qualified-immunity doctrine under an objective standard. As was stated in the prior Opinion, "[Q]ualified immunity does not turn on whether an officer is motivated by good intentions or malice." Thorp II, 2018 WL 2364291,

at *8 (quoting <u>Messerschmidt v. Millender</u>, 565 U.S. 535, 571 (2012)); <u>see also</u> <u>Crawford–El v.</u> <u>Briton</u>, 523 U.S. 574, 588 (1998) ("[A] defense of qualified immunity may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated. Evidence concerning the defendant's subjective intent is simply irrelevant to that defense."). Thorp's continued emphasis on Kyle's motivation is therefore not germane to the application of qualified immunity.

The Court notes, moreover, that the myriad citations in Plaintiff's Motion do nothing to rebut this point; indeed, one of his referenced cases <u>supports</u> the objective analysis of the prior Opinion. Thorp's reliance on <u>Harlow v. Fitzgerald</u>, 457 U.S. 800 (1982), in fact, is misplaced to the point of being disingenuous. Plaintiff quotes language from the case stating that qualified immunity may be defeated if an official "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], or if he took action with the malicious intention to cause a deprivation of constitutional rights." Mot. at 7 (quoting <u>Harlow</u>, 457 U.S. at 815). Pointing to the latter, subjective inquiry, Thorp asserts that Kyle's allegedly malicious actions should therefore deprive him of a qualified-immunity defense. Yet Plaintiff conveniently omits the fact that, only paragraphs later, the court in <u>Harlow</u> in fact <u>overruled</u> the use of "subjective" inquiries in qualified-immunity analysis – including "allegations of malice." 457 U.S. at 817-19. The case went on to hold that qualified immunity should instead rely on "the <u>objective</u> reasonableness of an official's conduct, as measured by reference to clearly established law." <u>Id.</u> at 818 (emphasis added). This is the standard the Court applied in the prior Opinion, and although Plaintiff may wish otherwise, it is the law.

6

C.  § 1983 Claims

In the prior Opinion, the Court granted summary judgment for Defendants on each of

Plaintiff's Fourth Amendment claims brought against Kyle.  See Thorp II, 2018 WL 2364291, at

*4.  Thorp now alleges a series of errors in that analysis, none of which gives the Court reason to

reconsider its previous determinations.

1.  *Issuance of First Warrant*

Thorp begins by protesting the Court's finding that the application for the first warrant

presented by MPD did not violate his Fourth Amendment rights.  See Mot. at 8-10.  The prior

Opinion concluded that his claims against Kyle based on the warrant's procurement could not go

forward, as that officer played "no role in preparing or submitting the warrant for judicial

approval."  Thorp II, 2018 WL 2364291, at *5.  Perhaps finally recognizing that Kyle cannot be

held accountable for the alleged shortcomings in the warrant's issuance, Thorp now pivots to pin

the blame on various other entities, including the Humane Society officers and the District itself.

He alleges that the Court erred in upholding the issuance of the warrant because the observations

of the Humane Society officers did not support probable cause and because such officers were

permitted by Defendants to "obtain a warrant without any police oversight whatsoever."  Mot. at

11-12.  These assertions are unavailing.

First, this count in its current incarnation is asserted only against Kyle, see Thorp I, 142

F. Supp. 3d at 139–40, so any allegedly improper oversight or Monell claim against the District

no longer exists.  Second, even if other officers were Defendants, the Court has already

addressed the issue of probable cause in depth, and Thorp identifies no clear error, change in

law, or new evidence that would compel revisiting its earlier findings.  See Thorp II, 2018 WL

2364291, at *6 (concluding that observations of officers and other facts underlying first warrant

application "certainly provide probable cause"). In fact, the Court has already rejected the basis

of Plaintiff's renewed attack on the authority of the humane officers, finding that "the D.C. Code

clearly authorizes 'any humane officer' to obtain a search warrant when she has 'reasonable

cause to believe[] that the laws in relation to cruelty to animals have been or are being violated in

any particular building or place." Id. (quoting D.C. Code § 22-1005). Plaintiff's attempts to re-

argue these issues in the form of a Motion for Reconsideration finds no purchase here. Although

he may find it "difficult to imagine in our modern age a more vivid example of a deliberate

indifference to a citizen's civil rights" than humane officers' obtaining search warrants, see Mot.

at 14, the Court has already made clear that such hyperbole is no substitute for a viable legal

claim.

### 2. *Execution of First Warrant*

Thorp next disputes the Court's treatment of the execution of the first warrant, arguing

that the prior Opinion erroneously awarded Kyle qualified immunity on the related claims.

Plaintiff contends that the officer is entitled to no such defense, as his search went beyond the

bounds of the warrant by proceeding "once the dog was located and it was determined that it was

not injured or abused." Mot. at 8. He asserts that "Kyle and the other officers . . . were

repeatedly told that they could not" continue with the search, and that they persisted because they

were "intent on violating [Thorp's] Fourth Amendment rights by proceeding with a search which

had long concluded." Id. at 10.

The Court need not engage at length with this issue, as it thoroughly analyzed the

execution of the warrant in the prior Opinion. First, Plaintiff's assertion that the Court failed to

address the "admonition . . . that once what is being searched for is found, the search must end,"

Mot. at 10, ignores the Court's analysis of the plain text of the warrant. That document allowed

"officers [to] search anywhere they might find, for instance, a 'dead' animal or additional 'bowls' of dog food." Thorp II, 2018 WL 2364291, at *7. The freezer, the Court concluded, "was once such place." Id. Although the Opinion allowed that "[p]erhaps the warrant went too far in so authorizing" the officers, this observation does not change Kyle's entitlement to qualified immunity. As the Court concluded, "[A] reasonable officer" in Kyle's position "could have believed that the warrant application was valid," and thus "should not be held personally liable" for the concomitant search for any "evidence of animal cruelty." Id. at *5, 7.

Thorp additionally alleges that the freezer should have been off limits because the humane officers did not think "it was good idea to enter the Plaintiff's freezer." Mot. at 9. Yet the Court already established that whether or not the humane officers believed that searching the freezer was a "priority," such conduct was permitted under the plain terms of the warrant and was thus reasonable for an officer in Kyle's position to pursue. See Thorp II, 2018 WL 2364291, at *7-8. Finally, to the extent that Plaintiff renews his claims regarding Kyle's "subjective intent," Mot. at 10, the Court has already explained that such allegations are immaterial to the application of qualified immunity. See Thorp II, 2018 WL 2364291, at *8. In sum, Plaintiff raises no clear error, new evidence, or other justification under Rule 59(e) to cause the Court to reconsider its prior analysis of the search conducted pursuant to the first warrant.

### 3. *Sufficiency of Second Warrant*

Plaintiff next targets the Court's assessment of the second warrant, which was obtained after Kyle recognized the capsules contained in Thorp's freezer as the drug MDMA. According to Plaintiff, "[T]he purported sight of capsules in the Plaintiff's freezer, after already observing a multitude of prescription bottles with [his] name upon the prescription labels in plain view, could not create probable cause for yet another warrantless search." Mot. at 20. The Court, once more,

9

disagrees.  It has already concluded that it was at least <u>reasonable</u> for Kyle to believe he had

probable cause to procure the second warrant, as the officer "appropriately relied on his

'training' to recognize" the drugs and, assuming he did in fact notice Thorp's prescriptions,

could have "readily distinguished" between those medications and the capsules found in the

freezer.  <u>See</u> <u>Thorp II</u>, 2018 WL 2364291, at *9-10.   Thorp's Motion provides no cause for the

Court to revisit those findings.

So, too, with Kyle's decision to conduct a field test of the suspected drugs before

obtaining the second warrant.  Plaintiff accuses the Court of "sidestep[ping] yet another critical

issue in this case" – namely, why Kyle should not be held liable for "breaking open capsules

which so obviously did not contain the items enumerated in the first warrant."  Mot. at 21.  Far

from ignoring this question, however, the Court already answered it with five paragraphs of

analysis in the prior Opinion.  After addressing Thorp's assertions regarding the field test, the

Court concluded that Kyle was entitled to qualified immunity, as "the existing precedent" on the

issue of warrantless field tests "<u>supported</u> Kyle's" decision.  <u>See</u> <u>Thorp II</u>, 2018 WL 2364291 at

*11.  The precedent has not changed in the two months since the Opinion issued, and neither has

the Court's conclusion that Kyle's field test did not violate clearly established "constitutional

rights of which a reasonable person would have known."  <u>Id.</u> at *10 (quoting <u>Pearson v.</u>

<u>Callahan</u>, 555 U.S. 223, 231 (2009)).

Thorp next contends that the importance of Defendants' alleged "withholding of

photographic evidence . . .elude[d] the grasp of the Court."  Mot. at 22.   He asserts that "what

was <u>intended</u> to be demonstrated by the Plaintiff at trial" was that the plastic bag seen in one

photo was "folded in a manner to fit inside the green box immediately next to it."  <u>Id.</u>  It is

therefore his position "that not only did Kyle enter the freezer without authority, [but] he opened

the green box to remove the baggie from it." Id. Plaintiff now seemingly claims that when Kyle

opened the freezer, the pills were not in fact in plain sight, therefore calling into question the

basis of the field test and the second warrant.

It is perhaps not surprising that the Court did not "grasp" this argument, as it was never

previously made. Thorp's "green-box theory" did not appear in his briefing, he explains,

because he "intended to reserve" this point "for trial," having "not anticipated" the "wholesale

condemnation of his entire case by the Court." Mot. at 22 n.5. Of course, summary judgment

could never be granted if a party were permitted to keep certain evidence and argument under

wraps for trial without penalty. Whatever Plaintiff's beliefs regarding the strength of his case, it

was his burden to vigorously oppose the District's Motion for Summary Judgment – a motion

that could naturally result in the "wholescale" termination of his case. To the extent Thorp

decided not to raise material disputes of fact in the hopes of a trial surprise, he ran the risk that

his case would never actually make it that far.

4. *Animal Cruelty*

In addition to attacking the Court's analysis of the first and second warrants, Thorp once

more contests his alleged charge of animal cruelty and the seizure of his Doberman Pinscher,

Vaughn. He asserts that the Court improperly granted Kyle qualified immunity, as the officer

arrested him "without any suggestion of" the "element of intent for the offense of cruelty to

animals." Mot. at 26. The Court already disposed of this issue, however, when it found that

"[g]iven that [his] arrest was 'legally justified' on [the] ground" of the charges for possession

with intent to distribute, it was not required to "decide whether [Kyle] independently had

probable cause to arrest Thorp on grounds of animal cruelty." Thorp II, 2018 WL 2364291, at

*11.

11

As to the seizure of Vaughn, the Court acknowledged that the Humane Society would have had "little reason to keep the Doberman" after Plaintiff's release "but for the animal-cruelty charges." Id. In his Motion, Thorp accuses the Court of "conveniently feign[ing] ignorance" as to the timing of his release, asserting that it should have been apparent that this occurred within 14 days and that he was thus entitled to the return of his pet. See Mot. at 23. The Court, on the contrary, "assum[ed] he was released within 14 days" and analyzed the issue of the dog's seizure accordingly. See Thorp II, 2018 WL 2364291, at *11 (emphasis added).

The Court sees no reason to reconsider its prior determination that Kyle was entitled to qualified immunity for charging Thorp with animal cruelty and the related seizure of the dog. As the previous Opinion held, the officer believed that Plaintiff had "forcefully struck" his dog and that a warrant had been issued to search his home for evidence of animal cruelty. Id. at *12. Regardless of the fact that "the search did not unearth any new evidence of animal cruelty," the Court concluded that "a reasonable officer could assume that there were still sufficient grounds for" the animal-cruelty charge underlying the seizure of Vaughn. Id. Plaintiff's Motion does not cause the Court to doubt that conclusion, and it thus finds that Thorp's dog-related arguments are all bark, no bite.

B.  Seizure and Damage Claims

1. *Seizure of Currency*

Thorp next disputes the Court's analysis of his claims regarding the allegedly unlawful seizure of $53,326 in cash from his home. See Mot. 15-17. The prior Opinion noted that the District had "returned the funds" and found that "what remains of this controversy (if anything) [was] not properly before the Court," as Plaintiff had failed to properly allege any such claim in his Complaint. Thorp II, 2018 WL 2364291, at *12. The Court noted that although it had denied

Thorp's attempt to file a supplemental complaint with claims related to the cash, it had offered

him "multiple invitations . . . to amend his Complaint with such allegations." Id. at *13

(emphasis added). Thorp declined to do so, and the Court concluded that his operative pleading

did not articulate a claim with respect to the seizure of the funds. Id.

Thorp's Motion asserts that "[t]he Court now appears to blame the Plaintiff for some sort

of inaction" with respect to adding the cash-seizure claims, and that it "violates Rule 15 by again

not accepting" his evidence and not "freely permitting an amendment" of his operative pleading.

See Mot. at 16. The Court does indeed hold Plaintiff accountable for his failure to amend his

Complaint. It has twice explained the distinction between supplementing and amending a

complaint and the reason why Thorp's attempt to add "allegations and causes of action related to

Defendants' alleged seizure of $53,326" had to be be pursued via the latter route. See Min.

Order of Dec. 15, 2015; ECF No. 49 (Memorandum Opinion of Apr. 12, 2016) ("The Court's

instructions to Plaintiff regarding any Rule 15(d) motions could not have been clearer: a

supplemental pleading may be filed only if it is limited to allegations about facts that occurred

after the filing of the Second Amended Complaint in July 2015."). It twice offered him

opportunities to amend, see id., noting that it remained a "mystery" as to why he continued to

take the position that "all of his new allegations" could be joined instead via supplementation.

See Mem. Op. of Apr. 12, 2016, at 10. Thorp's contention that the Court "violate[d] Rule 15" by

not permitting "amendment" holds little water given that, after all the Court's guidance, no

motion to amend was ever filed.

Trying a different tack, Thorp now also asserts that he did in fact raise the unlawful-

seizure allegations in his Second Amended Complaint. See Mot. at 17. This argument rings

hollow, however, in light of his repeated efforts to supplement that pleading to add allegations

regarding the funds.  As the Court noted two and a half years ago in Thorp I, Plaintiff's Second

Amended Complaint never mentioned the $53,326, nor did it tether his vague references to "cash

receipts" to any specific claim.  See Thorp I, 142 F. Supp. 3d at 148; SAC, ¶¶ 62-63.  It was not

until his attempt to supplement that pleading that he asserted any specific facts or claims

regarding the cash, showing that he was aware of the need to correct the deficiency in his

Complaint.  See ECF No. 33 (Mot. to Supp. Compl.).  The Court, accordingly, sees no need to

revise its prior conclusion that any dispute related to the funds is beyond the scope of this suit.

      Thorp's Motion, moreover, does not address the fact that he has not sufficiently

established any injury resulting from the District's seizure of the funds pursuant to the second

warrant.  Plaintiff states only that he "sustained [a] due process violation," Mot. at 17, yet the

Court explained in Thorp I that his unlawful-seizure allegations were not actionable under the

Fifth Amendment, as "[his] property was seized during a pretrial search," and "complaint of that

seizure [thus] sounds in the Fourth Amendment."  Thorp I, 142 F. Supp. 3d at 140.  While

Thorp's Second Amended Complaint may have made a passing mention of "cash receipts" and

his (long-ago dismissed) "Deprivation of Property Interest" count alleged that he "suffered  . . .

financial damages by deprivation of . . . funds intended to be used to renovate his real estate

rental property," see SAC, ¶¶ 62, 87, he provides no record evidence of any harm ensuing from

the seizure – especially now that the money has been returned.  Even in a world in which his

cash-seizure claims had been properly presented, they thus would not have survived summary

judgment.

      2.  *Property Damage*

      In a similar vein, Thorp also contests the Court's treatment of his property-damage

claims.  Because his briefing "inadequately addresse[d] any claim related to property damage,"

the Court previously declined to address the matter.  Thorp II, 2018 WL 2364291, at *12.

Plaintiff now contends that the prior Opinion erred by finding that he failed to "press a

challenge" that "both the first and second warrants may have been executed improperly, such

that his property was damaged."  Id.  He asserts that he did not oppose Defendants' Motion for

Summary Judgment on the property-damage claims because he was unable to "address[] all

issues" in his briefing, a shortcoming he attributes to "the Court's 45 page limitation."  Mot. at

27.  Thorp therefore argues that, regardless of his briefing, the Court should have deemed the

property-damage issue "entirely appropriate for trial."  Id.

The Court disagrees.  In its Motion for Summary Judgment, the District alleged that

Plaintiff had "provide[ed] no evidence of deliberate or inappropriate property damage exceeding

the scope of the searches."  Def. MSJ at 24.  In his Opposition, Thorp declined to point to any

record evidence or to make any legal arguments disputing this point, other than a stray statement

that he could "testify to the damage of his home."  Pl. Reply at 3.  He made no assertions,

moreover, as to whether any such damage was intentional or excessive, and the Court therefore

found no "material dispute of fact" on that point.  Because Thorp articulated no opposition to

Defendant's arguments on this issue, the Court once more concludes that summary judgment was

appropriate.

    D.  State-Law Claims

        1.  *Negligent Supervision*

Thorp concludes his Motion by turning to the Court's analysis of his state-law claims.

First, he alleges that the Opinion improperly analyzed his negligent-supervision count as a matter

of state law, instead of as a "cause of action under § 1983 as intended."  Mot. at 28.  Plaintiff

argues that the Court could, and should, have treated his negligent supervision/negligent

retention claims as "Monell liability causes of action."  Id.

Yet it already did so.  As it stated in Thorp I, "[I]t is unclear whether Thorp intends to

plead a common-law or constitutional claim in [Count IV], but the Court will give him the

benefit of the doubt by considering both."  142 F. Supp. 3d at 139.  The Opinion then went on to

explain why the negligent-supervision allegations could not proceed as constitutional claims,

finding that "while [the count] recites some of the elements of Monell liability[,] . . . it is

unaccompanied by any specific factual allegations . . . about how MPD came to know or should

have known" about Kyle's allegedly unlawful searches.  Id.  Because Thorp's Second Amended

Complaint did not sufficiently meet this pleading standard, the Court dismissed the negligent-

supervision count as "insufficient under § 1983" and allowed only his common-law negligent-

supervision claim to proceed.  Id. at 140.

In Thorp II, the Court analyzed the merits of this remaining, common-law cause of action

under Count IV.  It concluded that Plaintiff had once more failed to "establish the District's

liability," as "Kyle's mere proximity to two allegedly unconstitutional searches – nearly eight

years before the alleged incident – does not constitute a pattern of 'dangerous or otherwise

incompetent' behavior for which the District can be held responsible."  Thorp II, 2018 WL

2364291, at *13-14.  While Thorp may disagree with this characterization of Kyle's past

conduct, it remains the conclusion of the Court that Plaintiff failed to proffer evidence sufficient

to support a claim against the District for negligent supervision or retention.  Thorp's new

protestations that the District is liable for failing to supervise and train the humane officers who

obtained the warrant, see Mot. at 12-14, fall similarly short.  While Plaintiff brought a negligent-

supervision claim against the District for failure to supervise <u>Kyle</u>, his Complaint never alleges

any failure of oversight with respect to the humane officers.  <u>See</u> Compl., ¶¶ 102-107.

To the extent that Thorp now accuses the Court of "usurp[ing] the function of the jury to

determine whether the District of Columbia knew or should have known its employee behaved in

a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or

constructive knowledge, failed to adequately supervise the employee," Mot. at 28, the Court

clarifies that no reasonable jury could find that the record evidence regarding Kyle's past acts

supports holding the District liable in this case.  <u>See</u> <u>Rawlings v. D.C.</u>, 820 F. Supp. 2d 92, 116

(D.D.C. 2011) (granting summary judgment for District when Plaintiff failed to provide

"sufficient evidence upon which a jury could reasonably hold the District of Columbia liable"

under common-law claim for negligent training and supervision).

2. *Abuse of Process*

Thorp turns his final criticism to the Court's treatment of his abuse-of-process claims.

He contends that it "incorrectly characterizes what process Kyle has abused," now alleging that

the officer "presented, or caused to be presented a criminal complaint and initiated a civil

forfeiture process," and that "[s]olely as a result of Kyle's judicial actions, the Plaintiff lost his

freedom, his dog, and his currency."  Mot. at 29-30.  It is perhaps not surprising that the Court

did not consider such "judicial actions" in the prior Opinion, as they are nowhere to be found in

Thorp's operative Complaint.  Instead, the two counts of abuse of process included in that

pleading are both predicated on Kyle's "arresting the Plaintiff and seizing his property."  SAC,

¶¶ 125, 129.

As the Court explained in the prior Opinion, neither of these actions can "properly form

the basis of an abuse-of-process claim."  <u>Thorp II</u>, 2018 WL 2364291, at *14.  Noting that Thorp

had "shift[ed] gears" in his briefing to include other theories of abuse of process, the Court

nonetheless considered Plaintiffs' arguments that Kyle had improperly applied for the search

warrants and that the District should be held vicariously liable for the acts of two other officers

involved in the search. Id. at * 14-15. Finding that neither contention provided any basis to hold

the Kyle or the city liable, the Court granted summary judgment for Defendants. It is true that

the Opinion did not discuss any "criminal complaint" or "civil forfeiture process," but that is

hardly the result of any "incorrect characteriz[ation]" of Plaintiff's claims, given that such

allegations were entirely absent from his Complaint or summary-judgment briefing. It is not the

function of the Court to engage in speculation or prophecy as to potential bases for claims of

relief; if Thorp intended to allege that Kyle's "judicial actions" provided grounds for the abuse-

of-process counts, he could have so pleaded. As he did not, the Court finds that there is no basis

for reconsideration under Rule 59 on this issue.

## IV.  Conclusion

For the foregoing reasons, the Court will deny Plaintiff's Motion for Reconsideration.

The Court will issue a contemporaneous Order to that effect this day.


/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge


Date: July 30, 2018